UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

PETER J. APOSTLE,                                    Case No. GG 11-01008
                                                     Chapter 7
      Debtor.

_____/

FIRST HORIZON HOME LOAN
CORPORATION, KJELL ALEXANDER
AUMAUGHER, ANGELA AUMAUGHER,
& KRISTIANE MARIE AUMAUGHER,

      Plaintiffs,                                   Adv. Proc. No. 11-80228

v.

PETER J. APOSTLE,

      Defendant.

_____/

## OPINION REGARDING NONDISCHARGEABLE DEBT ADVERSARY PROCEEDING

Appearances:

Kay E. Kossen, Esq., Kalamazoo, Michigan, attorney for First Horizon Home Loan
    Corporation, Kjell Alexander Aumaugher, Angela Aumaugher, and Kristiane
    Marie Aumaugher, Plaintiffs.

Thomas M. Wardrop, Esq., Grand Rapids, Michigan, attorney for Peter J. Apostle,
    Debtor-Defendant.

## I. INTRODUCTION.

This adversary proceeding arises from the sale of a condominium and boat slip
(collectively, the "property") located in Muskegon, Michigan. The property was originally
owned by the Debtor-Defendant, Peter J. Apostle, and his wife Kathryn Apostle (the
"Apostles"), and sold to Thomas and Kathryn Bergeman (the "Bergemans") on land

contract.   During the term of the land contract, the Apostles obtained a loan from Fifth Third Bank, and Fifth Third placed a properly recorded mortgage on the property.   The Bergemans subsequently sold the property to Kjell Alexander ("Alex") Aumaugher, his wife Angela Aumaugher, and his sister, Kristiane Marie Aumaugher (the "Aumaughers").   The Aumaughers financed their purchase of the property by obtaining a loan from First Horizon Home Loan Corporation ("First Horizon" or collectively with the Aumaughers, the "Plaintiffs").   The First Horizon loan was also secured by a mortgage on the property.   Although Apostle received the balance due under the land contract from the Bergemans as part of the sale transaction, the Fifth Third loan was never re-paid and the Fifth Third mortgage remains outstanding.   The Plaintiffs brought this adversary proceeding seeking a determination that the "debt" owed by the Debtor-Defendant as a result of his failure to disclose the Fifth Third lien at the sale closing is excepted from his discharge under 11 U.S.C. § 523(a)(2)(A).[1]

## II. JURISDICTION.

This court has jurisdiction over this bankruptcy case.   28 U.S.C. § 1334.   The case and all related proceedings have been referred to this court for decision.   28 U.S.C. § 157(a); Local Rule 83.2(a) (W.D. Mich.).   This adversary proceeding is a core

---

[1] The Plaintiffs' complaint also asserts a count for willful and malicious injury under § 523(a)(6).   However, the Plaintiffs offered no evidence or argument in support of this cause of action at trial.   With the exception of one conclusory sentence, § 523(a)(6) was likewise not addressed in the Plaintiffs' post-trial brief.   Regardless, the court has considered whether the Plaintiffs have established that they are owed a nondischargeable debt under § 523(a)(6).   They have not.

proceeding. 28 U.S.C. § 157(b)(2)(I) (determinations regarding dischargeability of a debt). Notwithstanding a recent Supreme Court decision, Stern v. Marshall, __ U.S. __, 131 S. Ct. 2594 (2011), this court is constitutionally authorized to enter a final order. See Tibble v. Wells Fargo Bank, N.A. (In re Hudson), 455 B.R. 648, 656 (Bankr. W.D. Mich. 2011) (the Stern decision is extremely narrow; "[e]xcept for the types of counterclaims addressed in Stern v. Marshall, a bankruptcy judge remains empowered to enter final orders in all core proceedings"). This opinion constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## III. FACTS AND PROCEDURAL BACKGROUND.

Trial of this adversary proceeding was held on January 20, 2012.[2] During the trial, the court heard testimony from three witnesses. Peter J. Apostle, the Debtor-Defendant ("Apostle") testified credibly about the general circumstances surrounding his acquisition of the property, the subsequent sale transaction, and the fact that the Fifth Third mortgage on the property remains outstanding. Eileen Miedona, Apostle's bookkeeper, provided brief, but helpful, testimony corroborating Apostle's explanation of how the failure to pay the Fifth Third loan with the proceeds from the sale of the property went unnoticed by Apostle for so long. Curiously, only one of the four Plaintiffs, Angela Aumaugher, appeared at trial. She also testified credibly, although her

---

[2] After the conclusion of trial, the court gave the parties an opportunity to file supplemental briefs or argument. The Debtor-Defendant submitted his Proposed Findings of Fact and Conclusions of Law on January 26, 2012, and the Plaintiffs submitted their Proposed Findings of Fact and Conclusions of Law on February 2, 2012. (AP Dkt. Nos. 64 & 66.)

knowledge of the material facts was extremely limited. She explained that her husband, Alex, knew more details than she did about the purchase of the property and the subsequent discovery of the Fifth Third lien. Indeed, the court was astounded when Angela Aumaugher testified truthfully that she first became aware that she was a plaintiff in this adversary proceeding when she received an email with the date and time of the trial a few weeks prior to the scheduled trial date.

Given the paucity of relevant testimony from the Plaintiffs, the majority of the following factual findings are gleaned from Apostle's testimony and, more importantly, from the ten exhibits admitted into evidence at trial.

## A. *The Apostles Purchase the Property.*

Apostle's fairly extensive background in the real estate development industry dates back to at least the mid-1990s.[3] At that time, Apostle was a member of S&A Development, a limited liability company that developed property commonly known as the North Pier Condos, located at 2411 Lake Avenue in Muskegon, Michigan. (Tr. at 13-14.)[4] The North Pier Condos were comprised of two buildings (a total of approximately 40-48 units) and related boat slips. (Tr. at 15-16.)

---

[3] In addition to working in real estate development, Apostle was a majority shareholder in a title insurance company, Harbor Title Agency, from approximately 1996 until 2006 and operated an insurance agency, Farm Bureau Insurance of Michigan, from 1978 until 2010. (Tr. at 23-27.)

[4] All citations are to the transcript from the trial held on January 20, 2012, and are denoted as "Tr. at ___" herein.

In approximately 1996, Apostle and his wife, Kathryn Apostle, purchased unit 3 of the North Pier Condos, and its boat slip, from S&A Development, LLC. (Tr. at 16.) To finance the purchase of the property, the Apostles obtained a loan from Old Kent Bank. (Tr. at 17.)

B. *The Apostles Sell the Property to the Bergemans on Land Contract.*

On September 1, 1997, the Apostles sold the property to Thomas and Karen Bergeman on land contract. (Plaintiffs' Exh. 1.) The total purchase price for the property was $110,000. (Id.) The land contract called for monthly payments of $865.50 to be made by the Bergemans to the Apostles, beginning in September 1997, and continuing until August 1, 2027, when the remaining balance would be due. (Id.) Paragraph 9 of the land contract gives the Apostles, as sellers, the right to place a mortgage on the property, but provides that "the aggregate amount due on all outstanding mortgages shall not, at any time, be greater than the unpaid principal of this [land contract] . . . ." (Id.) The land contract also required the Apostles to advise the Bergemans in writing of any mortgage placed on the property. The land contract was prepared under Apostle's direction and was recorded on July 22, 1998. (Id.; Tr. at 20-21.)

C. *The Apostles Re-Finance the Property.*

On December 16, 2003, the Apostles obtained a new loan, in the amount of $119,000 from Fifth Third Bank. (Plaintiffs' Exh. 3.) The new loan was secured by a mortgage on the property in favor of Fifth Third Mortgage -- MI, LLC. (Plaintiffs' Exh. 2.) The mortgage was recorded on December 23, 2003. (Id.) For unexplained reasons,

but probably due to an oversight, the mortgage covers only the condo and not the boat slip. (Tr. at 37.) Both the note and mortgage contain provisions requiring the Apostles to repay the new loan immediately upon sale of the property. (Plaintiffs' Exh. 3, p. 4; Plaintiffs' Exh. 2, ¶ 18.) As a result of the new loan, the prior Old Kent loan was paid off and the Old Kent mortgage was discharged. (Tr. at 29-30.)

D. *The Bergemans Sell the Property to the Aumaughers.*

In the summer of 2004, the Bergemans decided to sell the property to the Plaintiffs, Alex Aumaugher, his wife, Angela Aumaugher, and his sister, Kristiane Marie Aumaugher. Because of the land contract, the sale of the property was accomplished through an "escrow closing" that actually involved two separate transactions.

1. *The Apostles Give a Warranty Deed to the Bergemans.*

Apostle testified that he became aware of the Bergemans' plan to sell the property when Nexus Realty, the Bergemans' listing agent, contacted him a few days before the closing. (Tr. at 41-42.) He did not, however, know the identity of the Bergemans' purchasers, did not know how the transaction was being financed, and did not have any direct contact with the purchasers prior to or during the closing. (Tr. at 57-59; 67.) Instead, the transaction was handled by the listing agent and closing officer. Nexus Realty prepared a warranty deed for the closing, and asked Apostle to provide the land contract balance. (Tr. at 42.) As requested, Apostle prepared an Amortization Schedule showing the balance due and owing on the land contract and provided it to the closing officer at Nexus Title. (Plaintiffs' Exh. 10; Tr. at 44.) The Amortization

6

Schedule shows $109,009.14 in principal and accrued interest due under the land contract as of August 27, 2004. (Id.)

The Sellers' Closing Statement for the transaction reflects the $109,009.14 land contract balance and, after deductions for closing costs, lists the balance due to the Sellers (the Apostles) as "$107,988.14 + $75.00." (Plaintiffs' Exh. 9.) The "Payment of Existing Lien" section of the Sellers' Closing Statement is completely blank. When questioned about this at trial, Apostle admitted that he had signed the Sellers' Closing Statement. (Tr. at 48.) He acknowledged that, at the time of the closing, he knew he owed Fifth Third Bank under the December 2003 note. (Tr. at 50.) In hindsight, he also admitted that, because the amounts he owed to Fifth Third Bank under the note exceeded the land contract balance, he would have had to bring money to the closing to fully satisfy the Fifth Third obligation. (Id.) Apostle testified that he simply did not pay attention to these facts, and assumed the title insurance company would take care of paying Fifth Third and discharging the mortgage. (Tr. at 47-48.)

### 2.  The Bergemans Give a Warranty Deed to the Aumaughers.

Angela Aumaugher testified about the circumstances under which she, her husband, and her sister-in-law decided to purchase the property. She explained that the Aumaughers purchased the property as an investment and vacation home for their extended family. (Tr. at 87.) According to the closing documents, the purchase price for the property was $180,000.00. (Plaintiffs' Exh. 8.) To finance the purchase, the Aumaughers obtained a $133,750.00 loan from First Horizon. This loan was secured by a mortgage on the property. (Plaintiffs' Exh. 7.) The balance due from the

Aumaughers, listed on the closing documents as $45,395.80, was actually paid by Angela Aumaugher's father-in-law, Stanley Aumaugher. (Tr. at 96.) According to Angela Aumaugher's testimony, Stanley Aumaugher was present at the closing on August 27, 2004, and financed the purchase of the property, even though title was placed in his children's' names. (Id.) At the conclusion of the closing, the Bergemans transferred the property to the Aumaughers via warranty deed. (Plaintiffs' Exh. 6.)

Angela Aumaugher further testified that, at the time of the closing in August 2004, she did not know Peter J. Apostle and did not know that Fifth Third Bank had a mortgage on the property. (Tr. at 92-93.) She explained that neither she nor her husband had any contact with Apostle prior to, during, or immediately after the closing in August 2004. (Tr. at 105; 110.) This was entirely consistent with Apostle's testimony that he never talked to the Aumaughers before the closing and never spoke to them at the closing. Angela Aumaugher stated that she and her family would not have purchased the property if they had known there was a mortgage on the property that would not be discharged as a part of the sale. (Tr. at 101.) She also testified that she and her family members purchased title insurance as part of the sale transaction. (Tr. at 95.)

E. *Post-Closing Events.*

1. *Apostle Continues Paying on the Fifth Third Loan.*

Apostle testified that his brother, Kosta Apostolopoulos, picked up the check from Nexus Title after the closing. (Tr. at 51.) At Apostle's direction, his brother deposited the check in one of Apostle's accounts at Fifth Third Bank. (Id.)

8

Although Apostle did not immediately realize it, payments on the Fifth Third loan continued to be withdrawn from Apostle's bank account after the closing. (Tr. at 52.) Apostle testified that he was not aware that the payments were still being debited from his account because he had several accounts at Fifth Third Bank, all of which had significant amounts flowing in and out of them. (Tr. 52-53.) This particular account was a general personal account into which Apostle deposited commissions from his insurance business and funds from his various other businesses. (Tr. at 72-73.) Although he was unable to recall any specific examples, Apostle testified that other automatic deductions were also likely being made from the account. (Tr. at 80.)

In addition, Apostle had a bookkeeper, Eileen Miedona, who handled his books and records. Ms. Miedona corroborated Apostle's statement that, during the relevant time period, he had several bank accounts with large sums of money flowing in and out. (Tr. at 121.) Ms. Miedona stated that a deposit of $100,000 or more would not have been uncommon.[5] (Id.)

Apostle learned that payments were still being made on the Fifth Third loan when he closed his bank account at Fifth Third Bank and received a delinquency notice. (Tr. at 74-75.) At that time, Apostle called Nexus Title and Transnation Title to inquire about the problem. (Tr. at 76-77.) Apostle stated that he continued making payments on the loan to protect his credit until 2010, at which point he could no longer afford the

---

[5] Without Ms. Miedona's credible testimony, the court would have had doubt about Apostle's testimony that he was unaware of the continuing automatic deductions to pay the mortgage.

payments. (Tr. at 78-79.) On February 3, 2011, Apostle filed a voluntary petition under chapter 7 of the Bankruptcy Code.

### 2. Apostle Contacts the Aumaughers.

After Apostle learned that the Fifth Third mortgage was still outstanding, he also sent a letter to the Aumaughers advising them of the situation. (Tr. at 78.) According to Angela Aumaugher, the Aumaughers contacted their title company upon receipt of Apostle's letter. (Tr. at 94.) The title company assured the Aumaughers that the problem would be "taken care of" and "would not affect them in any way." (Id.)

### 3. The Aumaughers Transfer the Property to Stanley Aumaugher.

The Aumaughers appear to have taken the title company's advice to heart. To the court's surprise, in December 2011, with this adversary proceeding pending and the Fifth Third mortgage still encumbering the property, the Aumaughers sold the property to their father, Stanley Aumaugher. [6] (Tr. at 96-97.) The loan to First Horizon was completely satisfied with the proceeds from the sale and First Horizon's mortgage was discharged. (Tr. at 102.) Angela Aumaugher explained that she was completely

---

[6] The court was not the only party surprised by this development. On January 12, 2012, approximately one week before the scheduled trial of this adversary proceeding, the Plaintiffs' attorney filed a Motion to Adjourn Trial. (AP Dkt. No. 50.) In the motion, the Plaintiffs' attorney explained that she only learned that the Aumaughers had sold the property when she contacted them in preparation for trial. The Plaintiffs' attorney requested a lengthy six month adjournment, so that the "real parties in interest" could be identified and substituted as Plaintiffs. The court held a hearing on the Motion to Adjourn on January 19, 2012, and ultimately denied the motion. The court determined that a subsequent sale of the property was not dispositive of the real issue in the case – i.e., whether Apostle owed the Plaintiffs a nondischargeable debt as a result of his failure to disclose the Fifth Third lien.

unaware of this pending adversary proceeding at the time the property was sold to Stanley. (Tr. at 97-98.) She stated that she became aware that the Fifth Third loan was still outstanding just prior to the start of trial, when the three Aumaughers received a demand letter from Stanley Aumaugher. (Plaintiffs' Exh. 12., Tr. at 98-99.) Although the Aumaughers are now at risk of being sued by their father, Stanley, over the outstanding Fifth Third lien, Angela Aumaugher admitted that, to this point, neither she nor her husband have spent any money out of pocket on the purchase of the property or the ensuing litigation. (Tr. at 108.)

## IV. ISSUE.

The issue presented is whether Apostle owes the Plaintiffs a debt as a result of his failure to disclose the Fifth Third lien, and if so, whether that debt should be excepted from his discharge because it was obtained by "false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A).

## V. DISCUSSION.

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge "any debt – for money, property, [or] services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud . . . ." The Sixth Circuit Court of Appeals has held that, "[i]n order to except a debt from discharge under 11 U.S.C. § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the

11

creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 280-81 (6th Cir. 1998) (citing Longo v. McLaren (In re McLaren), 3 F.3d 958, 961 (6th Cir. 1993)); Flagstar Bank, FSB v. Stricker (In re Stricker), 414 B.R. 175, 181 (Bankr. W.D. Mich. 2009). "Openly false assertions are not a strict requirement, however, as it is well-established that 'material omissions can [also] form the basis of misrepresentation under § 523(a)(2)(A).'" Digital Commerce, Ltd. v. Sullivan (In re Sullivan), 305 B.R. 809, 823 (Bankr. W.D. Mich. 2004) (quoting McHenry v. Ward (In re Ward), 115 B.R. 532, 539 (W.D. Mich. 1990)); see also Semaan v. Allied Supermarkets, Inc. (In re Allied Supermarkets, Inc.), 951 F.2d 718, 728 (6th Cir. 1991) (in a case decided under section 17(a)(2) of the former Bankruptcy Act, the predecessor to § 523(a)(2)(A), the court explained that the fact that the "deception takes the form of an intentional nondisclosure of a material fact or an implied representation makes no difference").

To except a debt from discharge, each of these elements must be proven by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654 (1991). Exceptions to discharge are to be strictly construed against the creditor. Rembert, 141 F.3d at 281 (citing Manufacturer's Hanover Trust v. Ward (In re Ward), 857 F.2d 1082, 1083 (6th Cir. 1988)).

The court shall address each element of the Plaintiffs' cause of action in turn. Because the First Horizon loan has been completely satisfied as a result of the sale to Stanley Aumaugher, thereby precluding First Horizon from proving that it sustained any

12

damages as a result of Apostle's alleged misrepresentation,[7] the court's analysis shall focus primarily on the claims of the individual Plaintiffs, the Aumaughers.

A. *Material Misrepresentation.*

The Plaintiffs have identified only one possible misrepresentation or omission made by Apostle: the Sellers' Closing Statement executed by Apostle in connection with the August 27, 2004 sale transaction. That closing statement included a section titled "payment of existing lien" but was left blank, thereby failing to disclose the existence of the Fifth Third mortgage. At the time, Apostle knew he was indebted to Fifth Third Bank under the December 2003 note and was aware of Fifth Third's outstanding mortgage on the property. However, despite the closing statement's failure to list the Fifth Third mortgage, Apostle signed the document, representing that he "had examined the above statement and [found] it correct." (Plaintiffs' Exh. 9.)

Was the Sellers' Closing Statement signed by Apostle false and inaccurate? Without question, it was. The court has no difficulty concluding that Apostle made a material misrepresentation or omission when he signed the closing statement which failed to disclose the outstanding Fifth Third lien on the property. But, to whom was this misrepresentation made? Somewhat surprisingly, the initial, direct recipient of this information was not identified at trial, although the court infers that the completed closing statement was initially submitted by Apostle to the escrow or title agent who handled the closing. Apostle may have had reason to expect that the documentation he

---

[7] Damages are discussed in Section V.E., *infra*.

13

signed in connection with the closing would be forwarded on to other parties to the transaction, including the Bergemans, as land contract vendees.  And, although he did not know their exact identity, Apostle may have also expected that the information would be forwarded to the subsequent purchasers of the property, the Aumaughers.  In certain instances, a debtor's liability for a fraudulent misrepresentation may extend to such indirect recipients of the false statement, if they are parties the misrepresentation could be reasonably expected to reach.  See Restatement (Second) of Torts §§ 531 and 533, cmt. b (1977) ("One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.  This rule applies "not only when the effect of the misrepresentation is to induce the other to enter into a transaction with the maker, but also when he is induced to enter into a transaction with a third person.")

Although it may have been reasonable to expect that the representations in the Sellers' Closing Statement would be shared with the Bergemans, and possibly the Aumaughers, there is *no* evidence that actually occurred.  The evidence at trial failed to establish who may have seen the erroneous closing statement.  There is, however, one party who certainly did not:  Angela Aumaugher.  Further, although none of the other Plaintiffs testified, there was no evidence to demonstrate, or even suggest, that Alex Aumaugher, Kristiane Aumaugher, or First Horizon received a copy of the closing

14

statement or were aware of the information contained therein. It is undisputed that neither Angela Aumaugher, nor any of her family members, spoke with Apostle in connection with the closing. Not once. The Aumaughers did not even know Apostle's name until years after the transaction was completed. Without evidence that the Aumaughers actually received a copy of the closing statement or even knew it existed, it is impossible to conclude Apostle made a misrepresentation or omission, either directly or indirectly, to them. The first element of the Plaintiffs' nondischargeable fraud cause of action has not been met.

B. *Intent to Deceive.*

The Plaintiffs have also failed to establish that Apostle made the misrepresentation on the Sellers' Closing Statement with the intent to deceive or with reckless disregard of the truth. At first blush, Apostle's characterization of the facts in this adversary proceeding as, essentially, nothing more than an honest mistake seemed highly implausible. It is difficult to believe that an intelligent man like Apostle could inadvertently fail to disclose the existence of the Fifth Third mortgage in the closing statement, receive over $100,000 in sale proceeds, deposit those funds in his bank account and continue paying on the loan for years, all without recognizing the mistake or intending to deceive anyone.[8]

---

[8] After reading the pleadings and exhibits in preparation for trial, the court believed the Plaintiffs had a very strong case; after the close of proofs, the court thought exactly the opposite. There are excellent reasons to conduct trials and defer final judgment until they are concluded.

15

But that is indeed what the evidence establishes.  Apostle testified credibly that he was aware of the Fifth Third mortgage when he conveyed the property to the Bergemans on August 27, 2004.  Despite this, he signed the Sellers' Closing Statement, which failed to disclose the existence of the lien.  He acknowledged that the closing statement was inaccurate and false.  He then received proceeds from the sale of the property to the Bergemans (and ultimately to the Aumaughers) and directed his brother to deposit the proceeds in his bank account.  He overlooked both this initial deposit and the subsequent withdrawals of continued payments on the Fifth Third loan for years because there were significant amounts flowing in and out of the account and his financial records were handled by his bookkeeper, Ms. Miedona.  The mistake only came to his attention when he closed his account with Fifth Third bank and received a deficiency notice.  Upon recognizing the error, he contacted the title insurance companies and the Aumaughers to disclose the problem.

Under these circumstances, the court cannot conclude that Apostle intended to defraud anyone or that he signed the Sellers' Closing Statement in reckless disregard of its truth.  Apostle's failure to disclose the Fifth Third lien on the Sellers' Closing Statement was a mistake that went unnoticed by Apostle.  Apparently, Apostle was in good company in overlooking the error, considering that all of the other parties to the sale transaction, including the title insurance companies involved,[9] also failed to

---

[9] Angela Aumaugher testified that she, her husband, and her sister-in-law purchased title insurance when they bought the property from the Bergemans.  How the title company missed the recorded mortgage is anyone's guess.

16

recognize Fifth Third's mortgage on the property.  The Plaintiffs have not established the element of intent.

## C. *Justifiable Reliance.*

Because the Plaintiffs were completely unaware of the misrepresentation made by Apostle on the Sellers Closing Statement, they have also failed to establish that they acted in reliance on the misrepresentation.  To satisfy the element of reliance under § 523(a)(2)(A), the United States Supreme Court has held that a creditor must demonstrate that its reliance on the debtor's false representation was "justifiable."  See Field v. Mans, 516 U.S. 59, 74-75, 116 S. Ct. 437, 446 (1995).  "Justifiable reliance requires proof that a plaintiff *actually relied* upon the defendant's false representations and that such reliance was justified under the circumstances."  Corradini v. Corradini (In re Corradini), 276 B.R. 571, 578 (Bankr. W.D. Mich. 2002), aff'd, 75 F. App'x 444 (6th Cir. 2003) (unpublished opinion) (citing Field v. Mans, 516 U.S. at 70) (additional citations omitted) (emphasis added); accord Kinsler v. Pauley (In re Pauley), 205 B.R. 501, 507 (Bankr. W.D. Mich. 1997) ("[T]he Supreme Court's requirement of 'justifiable' reliance, necessarily assumes proof of actual reliance.").

It is impossible to conclude that the Plaintiffs *actually relied* on the misstatements in the Sellers' Closing Statement, because there is no evidence that the Plaintiffs were even remotely *aware* of those misstatements.  When the Plaintiffs purchased the property, they relied on the fact that they would get clear title to the property as a result of the sale transaction.  To this end, the Aumaughers relied on the warranty deed they received from the Bergemans, and probably on the title company

17

that insured the transaction. They did not rely on the closing statement signed by Apostle, which they did not see and of which they had no knowledge.[10] Because the Aumaughers did not actually rely on Apostle's misstatement, the court need not consider whether their reliance was "justifiable."

D. *Causation*.

Finally, having failed to demonstrate any reliance on Sellers' Closing Statement, it is impossible for the Plaintiffs to prove that their reliance on Apostle's misrepresentation was the proximate cause of any loss. Angela Aumaugher testified that she and her family would not have purchased the property if they had known that the Fifth Third mortgage was outstanding and would not be discharged as part of the sale transaction. But again, the Plaintiffs' belief that they were receiving clear title to the property came from their transaction with the Bergemans (and involvement by an unknown title insurance company). In completing this aspect of the sale transaction, the Aumaughers reviewed settlement documents executed by the Bergemans and obtained

---

[10] Interestingly, the cases cited in the Plaintiffs' post-trial brief provide more support for this court's legal conclusions regarding reliance than they do for the Plaintiffs' arguments. For example, in P.H.H. U.S. Mortgage Corp. v. McDowell (In re McDowell), 145 B.R. 977 (Bankr. W.D. Mo. 1992), William and Nancy McDowell (the "debtors"), sold real property to Timothy and Carolyn Marek (the "purchasers"). As part of the sale, the debtors signed an affidavit stating that there were no outstanding liens on the property. In actuality, the debtors owed $27,000 to Herrman Lumber Company for materials used in construction of the home and Herrman Lumber had asserted a lien against the property in a state court action. The bankruptcy court held that the purchasers had established all elements of their fraud claim of § 523(a)(2)(A), but that Herrman Lumber had not. The court explained that Herrman's "remoteness" from the sale transaction made "it impossible for it to have relied on the [debtors'] false statement." Id. at 980. Further, Herrman failed to "even suggest what action it may have taken" in reliance on the false statement. Id. at 981. Like Herrman, the Plaintiffs in this adversary proceeding are too far removed from the false representation to have relied on it for purposes of § 523(a)(2)(A).

18

title insurance to ensure clear title to the property. Ultimately, they received a warranty deed from the Bergemans. The relationship between the Plaintiffs' actions and Apostle's misrepresentation regarding the Fifth Third mortgage is far too attenuated to support a cause of action for nondischargeable fraud.

E. *Damages.*

Assuming that the Plaintiffs had successfully established all requisite elements of their nondischargeable debt action, it would be difficult for them to prove any concrete, non-speculative damages. The Aumaughers did not pay any money out of pocket for the property when they originally purchased it from the Bergemans. That purchase was financed by Stanley Aumaugher and by the loan from First Horizon. The Aumaughers have not spent a penny on this litigation, which has apparently been financed by their title insurance company or some other unknown entity. They no longer even own the property, having sold it to Stanley Aumaugher just prior to the trial of this adversary proceeding. As a result of that sale, First Horizon's lien on the property has been completely satisfied. Under these circumstances, the court is unable to imagine how any of the Plaintiffs have been damaged as a result of Apostle's misrepresentation. The Plaintiffs must have had similar difficulty identifying any potential damages, as only one of the four Plaintiffs appeared to testify, and she did not even know about the on-going litigation until just prior to trial.

The Aumaughers – or more accurately, probably their closing agent and title insurance company, the true parties in interest, acting on their behalf – assert, however, that they will likely sustain damages in the future, if Stanley Aumaugher follows through

19

on his demand for clear title from them.  To meet their obligation to Stanley, the Aumaughers may be required to pay Fifth Third and discharge the outstanding mortgage.  The Aumaughers argue that this threat of an adverse judgment against them constitutes damage caused by Apostle's misrepresentation.  See P.H.H. U.S. Mortgage Corp. v. McDowell (In re McDowell), 145 B.R. 977, 980 (Bankr. W.D. Mo. 1992). Apostle counters that any such damages are too speculative to sustain the Plaintiffs' burden of proof on this element.  See, e.g., John E. Green Plumbing & Heating Co., Inc. v. Turner Constr. Co., 742 F.2d 965, 968 (6th Cir. 1984) ("A damage award must not be based on mere speculation, guess, or conjecture.") (citation and internal quotation marks omitted); cf. Schewe v. Fairview Estates (In re Schewe), 94 B.R. 938, 947 (Bankr. W.D. Mich. 1989) (damages for civil contempt may not be awarded if they are too remote or speculative) (citing Archer v. Macomb County Bank, 853 F.2d 497, 499 (6th Cir. 1988)).  Ultimately, although the court believes any asserted damages are too speculative, it need not decide this issue because the Plaintiffs have failed to establish the other elements required to support a nondischargeability claim under § 523(a)(2)(A).

## VI.  CONCLUSION.

For the foregoing reasons, this court concludes that the Plaintiffs have failed to establish even a single element of their claim that Apostle owes them a debt that should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).[11]  The Plaintiffs' complaint

---

[11] The court has considered whether 11 U.S.C. § 523(d) may be applicable in this adversary proceeding.  Section 523(d) generally requires the court to award a debtor reasonable costs and attorney's fees if the debtor prevails in a nondischargeability action for a "consumer debt" and the position of the creditor was not "substantially

20

shall be DISMISSED for no cause of action.  A separate order shall be entered accordingly.


Dated this 16th day of March, 2012
at Grand Rapids, Michigan

_____
Honorable James D. Gregg
Chief United States Bankruptcy Judge

---

justified."  Apostle did not assert that he was entitled to an award under this subsection and failed to present any evidence that the debt alleged by the Plaintiffs was a "consumer debt."  Because Apostle was a real estate developer and owned many properties, and the Aumaughers also purchased the property at least partially for investment purposes, the record suggests that the debt here was not a consumer debt. Therefore, the court declines to award any costs or fees.

21